## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **ANGELA S. WEIGEL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 09-CV-339-GKF-TLW** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Angela Weigel seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1382c(a)(3)(A).[1]  As set forth below, the undersigned recommends that plaintiff's case be affirmed.

## Introduction

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. § 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[1] Plaintiff's applications for SSI were denied initially. A hearing before Administrative Law Judge ("ALJ") John Volz was held on May 5, 2008. [R. 40]. By decision dated May 28, 2008, the ALJ denied plaintiff's claim. [R. 73]. The Appeals Council reversed and remanded the case for additional proceedings. [R. 74]. A second hearing was conducted by Judge Volz on December 30, 2008. [R. 16]. In a subsequent decision dated March 4, 2009, the ALJ again denied plaintiff's claim. [R. 8]. On her second attempt, the Appeals Council denied plaintiff relief. The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of the impairment during the time of her alleged disability.  20 C.F.R. § 416.912(b).  A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3).  "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. § 416.908.  The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians.  20 C.F.R. § 416.913(a).

## Background

Plaintiff was born on November 3, 1984. On December 6, 2005, plaintiff was referred to Family and Children Services ("FCS") by a boyfriend to seek counseling for her mood swings.  [R. 208].  On December 30, 2005, plaintiff filed for SSI.  She was 21 years old at the time.  [R. 147]. Plaintiff completed the eighth grade before dropping out of high school.  She does not have a GED. [R. 27, 176].  Plaintiff weighs 200 pounds and is 5'4" tall.  [R. 170].  She has a piercing in her right nasal and in her tongue.  [R. 362].  Plaintiff was raped at age 8 by her cousin, menarche at age 9, and raped and impregnated by her brother at age 13.  Her pregnancy was terminated by elective abortion. [R. 208].  At the time she filed for SSI on December 30, 2005, she was married to Nicholas Rolenc. [R. 147]  They divorced in 2006.[2]  [R. 183].  On January 17, 2006, plaintiff reported having four sexual partners.  [R. 362].  On April 28, 2006, clinical notes indicate plaintiff was pregnant and

---

[2]  Public records show Angela Rolenc and Nicholas Rolenc were granted a divorce in Tulsa District Court on March 6, 2006.  See www.oscn.net

2

living with her boyfriend, and his parents.  Her boyfriend is the father of her child.  [R. 23].  When

the boyfriend's parents decided to move to Barnsdall, plaintiff discussed housing options with FCS

because she did not want to move to Barnsdall.  Her first priority in counseling was to make plans

for housing.  She could not qualify for public housing because of her delinquent utility bills.  [R.

286].  She was appealing denial of SSI benefits and was using food stamps.  [R. 286].  On May 5,

2006, plaintiff reported that she, her boyfriend and two roommates were continuing to live in his

parents' former rent house.  They were allowed to keep utilities in his parents name if they paid them

on schedule.  Only one of the occupants had income.  [R. 284].  On May 19, 2006, plaintiff, her

boyfriend and four others were living in the house and no one had income.  The utility bills reached

$500 and plaintiff had depleted her food stamps.  [R. 283].  When asked by FCS what her plan was

on bringing income into the house, plaintiff replied that she "didn't have one" but she wanted

everyone in the house to work and help with expenses.  [R. 283].  On May 25, 2006, two more adults

moved into the house.  Plaintiff was working with a FCS counselor on assertive skills and learning

how to talk to others.  Plaintiff complained the house did not have enough rooms or furniture for all

occupants.  [R. 282].  On June 6, 2006, plaintiff reported "multiple stresses" because the electricity

was cut off, she felt she had no options, three more adults moved in the household, and she was

shouldering all the burden.  [R. 281].  On June 13, 2006, plaintiff reported her grandmother paid the

delinquent utilities and her food stamps were reinstated.  No one in the household was bringing in

income.  FCS assisted plaintiff in preparing a budget and stretching her food stamps.  [R. 280].  On

June 20, 2006, plaintiff's landlord demanded rent.  Plaintiff was under the impression the house was

provided to them rent free.  Plaintiff made arrangements to pay $300 per month on a rent-to-own

situation.  She was unable to pay the utilities until her grandmother and one roommate gave her

3

money.  Plaintiff told the FCS counselor that she was hopeful her SSI would be approved and benefits commenced.  [R. 279].  Plaintiff felt none of her roommates listened to her or took her seriously.  [R. 279].  On June 27, 2006, the water was cut off.  Plaintiff's grandmother sent her money, and plaintiff went to have the water restored.  Plaintiff "blew up" complaining that her roommates were not paying expenses or cleaning the house.  [R. 277].  On July 11, 2006, plaintiff received more money from her grandmother.  Plaintiff was arranging to find homes for some of the dogs living in her house.  Plaintiff was cleaning the baby's room and making arrangements for transportation for her delivery date.  [R. 276].  On June 27, 2006, plaintiff's counselor at FCS entered the following Case Assessment Report:

**Feeling Mood**

> Client reports feeling depressed and overwhelmed.  She has trouble with falling and staying asleep 3x weekly.  She feels drained of energy and motivation.  States she has to push herself to try and get things done.  States she does this for her baby due in Sept.  On going feelings of helplessness and hopelessness.

**Thinking**

> Client doesn't think she is experiencing hallucinations, but at times she believes she hears her name or people talking and no one is present.  She does have racing thoughts which contribute to her sleep problems.  She has difficulty with focus and concentration.  She has missed appointments.

**Medical/Physical**

> Has had many "female problems" and was told she had a 10% chance of getting pregnant and less than 5% of being able to carry to full term.  Client has carried baby longer that [sic] she thought she would and is due in mid September.  At this time she is taking no psych. meds but is considering once baby is born.  Meds:  Currently unsure if she is going to continue meds.

4

**Family**

> Client reports that grandmother recently sent her enough money to keep utilities on. Apparently, grandmother also offered to help with rent occasionally. Client says she and grandmother don't always get along and will go months without speaking. She feels alone since mother died.

**Interpersonal**

> Client is divorced and living with boyfriend and father of her baby. She admits he isn't much support when it comes to managing household. He often leaves decisions on her shoulders. There are roommates who eat all of the food and continue to bring more pets into the house. Client has given money to her friends so they will give her rides and then they don't show up. One of her friends was involved in criminal activity and the police showed up in the middle of the night with a search warrant. Client acknowledges this isn't good for her. She wants to surround self with more positive people, but has trouble asserting herself and feels she isn't listened to.

**Role Performance**

> Client identifies her role as a homemaker. She is able to cook and clean. The house she lives in is [in] desperate need of repairs for which there are no funds. Keeping the utilities on has been a monthly struggle. She is able to go to [the] store for food.

**Social-Legal**

> On probation until 2009 due to being charged w/ child abuse. Clt stated that she witnessed it but did not report it and was charged as well.

**Self Care/Basic Needs**

> Client, boyfriend and multiple roommates live in house that was previously rented by boyfriend's parents.

> Client believed there was arrangements that no rent was to be paid. However, landlord showed up and said they need to pay 300 monthly. There is no income coming into the house. All utilities had cut off notices. This paid by client's grandmother. There are excessive deposits and past due amounts before client can get utilities on in her name. The same is true for section 8. Past due money must be paid before she is eligible again. Client buys food with her stamps, but it is usually gone before the end of the month. She

doesn't yet have all that she needs to bring baby into the house.  Client has missed doctor appt. which is very dangerous due to her high risk pregnancy.  She continues to drive car that is not street legal even though she has already received one warning.

[R. 271-272].  At the hearing plaintiff identified her economic support as living in Section 8 housing, with utility allotments, food stamps, and her boyfriend's recent approval for social security benefits.  When the ALJ asked her the basis of her boyfriend's disability, Plaintiff responded:  "I don't remember.  He's got impulse control disorders and personality disorder and I think on the paperwork it said something about a major depression and I think that was it."  [R. 28].  The ALJ inquired whether plaintiff's boyfriend helped her out at home.  Plaintiff responded:  "We really neither one do much of anything."  [R. 29].  Plaintiff's baby was born in August, 2006.  [R. 365-368].  In her discharge summary at the Tulsa Regional Medical Center, dated August 9, 2006, plaintiff reported that she has had four sexual partners.  By age 22, plaintiff had four miscarriages, one elective abortion and a full term pregnancy.  [R. 366].  On November 6, 2008, plaintiff advised her counselor at FCS that she had "started fertility treatments and plans to get pregnant."  [R. 441].

Plaintiff's work history is minimal.  She worked as a filing clerk for a pool and spa company from July 2003 to October 2003, and as a cashier for K-Mart from October 2003 to November 2003.  [R. 162].  In 2003, plaintiff also worked for Deepwoods, Inc., Hardees, and Wal-Mart.  In 2006, plaintiff worked for Sears.  [R. 146].  Plaintiff quit her job with K-Mart and Wal-Mart and her remaining employment was terminated.  [R. 46].

Plaintiff alleges an onset date of October 1, 2005.  [R. 147].  Her alleged mental impairments are bipolar, agoraphobia, and post traumatic stress disorder which she alleges are manifested by severe anxiety in the work place.  [R. 19, 170].  Plaintiff denies having any physical impairments.

6

[R. 19].

## Decision of the ALJ

In assessing plaintiff's disability claim, the ALJ found at step one that plaintiff has not engaged in any substantial gainful activity since December 19, 2005, the application date. [R. 10]. At step two, the ALJ found plaintiff's medically determinable impairments to be mood disorder not otherwise specified, post traumatic distress disorder, and panic attack with agoraphobia. Id. At step three, the ALJ found that plaintiff does not have an impairment or combination of impairments that meet or medically equal the criteria of listings 12.04 (Affective disorders) and 12.06 (Anxiety Related Disorders) within 20 CFR, Part P, Appendix 1. In rating the severity of plaintiff's limitations, he found she has mild restrictions in her activities of daily living; moderate difficulty in social functioning; and moderate difficulty in concentration, persistence or pace; and no episodes of decompensation. [R. 11]. At step three, the ALJ found that plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the nonexertional limitation to perform only simple work. [R. 11]. At step four, the ALJ determined that plaintiff was capable of returning to her past work as a cashier. Alternatively, at step five, the ALJ considered plaintiff's age, education, work experience and determined plaintiff's ability to work was not significantly compromised because of her nonexertional limitation. In consulting a vocational expert, the ALJ found that plaintiff was capable of performing the following sedentary simple work: kitchen helper, maid, mail clerk, sorter, hand packer, assembler and other miscellaneous labor jobs and that such jobs existed in sufficient numbers in the regional and national economy. [R. 14]. This finding was made at steps four and five of the five step inquiry outlined in Williams v. Bowen, 844

7

F.2d 748, 750-52 (10th Cir. 1988) (discussing the five steps in detail).[3]

**Issues**

Plaintiff raises four issues on appeal:

(1)      Whether the ALJ failed to properly assess plaintiff's RFC.

(2)      Whether the ALJ erred in finding plaintiff could return to her past work.

(3)      Whether the ALJ erred in finding that plaintiff could perform other work.

(4)      Whether the ALJ failed to properly evaluate plaintiff's credibility.

[Dkt. # 18 at 1].

**Discussion**

The role of a court in reviewing the decision of the Commissioner under 42 U.S.C. § 405(g) is limited to a determination of whether the record as a whole contains substantial evidence to support the decision and whether the correct legal standards were applied.  See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001); Winfrey v. Chater, 92 F.3d 1017, 1019 (10th Cir. 1996); and Castellano v. Secretary of Health & Human Serv., 26 F.3d 1027, 1028 (10th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence."  O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994).  A court is

---

[3]  The five-step sequence provides that the claimant (1) is not gainfully employed, (2) has a severe impairment, (3) has an impairment which meets or equals an impairment presumed by the Secretary to preclude substantial gainful activity, listed in Appendix 1 to the Social Security Regulations, (4) has an impairment which prevents her from engaging in her past employment, and (5) has an impairment which prevents her from engaging in any other work, considering her age, education, and work experience.  Ringer v. Sullivan, 962 F.2d 17 (10th Cir. 1992) (unpublished) citing Williams v. Bowen, 844 F.2d at 750-52.

to consider whether the ALJ followed the "specific rules of law that must be followed in weighing particular types of evidence in disability cases," but the court will not reweigh the evidence or substitute its judgment for that of the ALJ.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).

As her first assignment of error, plaintiff contends the ALJ failed to properly assess plaintiff's RFC.  [Dkt. # 18 at 2].  Specifically, plaintiff contends the ALJ:  (1) failed to link his restriction to simple work to the three severe mental impairments and explain how the evidence supports his RFC assessment, [Dkt. # 18 at 3]; (2) failed to weigh Dr. Crall's conclusion that plaintiff's ability to complete most tasks appropriately and timely was likely compromised by her difficulties sustaining attention, [Dkt. # 18 at 4]; (3) failed to consider the GAF scores[4] of 42 to 49 assigned to plaintiff by FCS, [Dkt. # 18 at 5]; (4) failed to consider that her short-term work attempts as evidence of her inability to work, [Dkt. # 18 at 5]; and (5) failed to consider that the demands of work caused plaintiff severe anxiety. [Dkt. # 18 at 6].

The undersigned finds no merit to this claim.  The ALJ relied on substantial medical evidence in finding that plaintiff had the RFC to perform all levels of sedentary work, restricted only to simple tasks.   First, the ALJ found that plaintiff's treating physicians did not place any functional restrictions on her activities that would preclude simple tasks performed at a sedentary level.  [R. 11]. Second, the ALJ relied on Dr. Crall's professional mental health testing and her conclusion that plaintiff did not have any cognitive deficiencies, rather her all mental limitations were emotionally

---

[4]  GAF is an abbreviation for Global Assessment of Functioning and is a subjective determination based on a scale of 100 to 1 of a clinician's judgment of the individual's overall level of functioning. See Langley v. Barnhart, 373 F.3d 1116, 1123 (10th Cir. 2004).  Generally, a GAF score of 41-50 indicates "serious symptoms or a serious impairment in social, occupational, or school functioning. Id. See also American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).

based.  [R. 12].  He further found that plaintiff was receiving professional treatment for her emotional problems at FCS.  The ALJ relied on the professional opinion of FCS contained in its Case Assessment Report dated April 4, 2008, which identified plaintiff's emotional problems as "paranoia that someone was watching her" and the evaluation that "this was not an intensely felt feeling."  [R. 13].  He observed that the focus of plaintiff's treatment at FCS was to improve her mood swings and depression through management coping skills and its evaluation that plaintiff's prognosis on these identified mental impairments was "good."  [R. 13].

In <u>Flores v. Apfel</u>, 242 F.3d 388 (10th Cir. 2000) (unpublished),[5] the court states that where, as here, the plaintiff suffers from a severe mental impairment that does not meet the listings, the consideration of mental RFC must include an assessment of the ability to interact appropriately with the public, supervisors, and coworkers.  In his decision, the ALJ did not find plaintiff's testimony credible that she quit her job at Wal-Mart because of chronic anxiety "in dealing with the public."  The ALJ cited her prior inconsistent statement in her functional report that she was terminated because she argued with the store manager.  She also indicated that she did "OK with handling changes in routine."  [R. 13].  In discrediting the purported functional limitations of her panic disorder with agoraphobia, the ALJ relied on plaintiff's prior inconsistent statement in her functional report that "she shopped in stores for hours."  [R. 13].  He concluded that her allegations that she was "extremely agitated in the presence of others does not appear credible."  [R. 13].  The undersigned finds this evidence sufficient to meet the requirements of <u>Flores</u>.

As further evidence to support his RFC assessment, the ALJ discounted plaintiff's claim that

---

[5]  Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1:  10th Cir. R. 32.1.

her alleged bipolar disorder was a mentally limiting factor because the FCS and Dr. Crall both used the diagnosis of "mood disorder" and the FCS opined that her "prognosis was good." [R. 13]. The ALJ found that there was no source opinion of record that plaintiff's mental impairments rendered her unemployable. Finally, the ALJ found that his RFC assessment was supported by the state agency's mental RFC assessment, which provides:

> FUNCTIONAL CAPACITY ASSESSMENT
>
> Ct can understand and perform simple and some complex tasks. Ct can interact appropriately with others at a superficial level, but not with the general public. Ct can adapt to work situations.

[R. 247].

Plaintiff also contends the ALJ failed to explain why he gave no weight to the GAF scores of 42 and 49 assigned to plaintiff by the FCS, arguing that these scores demonstrate serious symptoms and serious impairment in occupational functioning. The undersigned finds that the ALJ did not error in failing to address plaintiff's GAF scores of 42 and 49 in his RFC assessment, because the ALJ did take into consideration medical evidence of plaintiff's mental evaluation, which are similar to those used to arrive at a GAF score. As detailed above, the ALJ relied on medical evidence to support his RFC evaluation and he gave specific reasons for his findings with references to the record in his determination. Moreover, the record does not show a substantial difference of opinion among those clinicians who evaluated plaintiff's mental condition. The Tenth Circuit has stated that, "a low GAF score does not alone determine disability, but it is instead a piece of evidence to be considered with the rest of the record." Petree v. Astrue, 260 Fed.Appx. at 42 citing Howard v. Comm'r of Soc.Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."). Plaintiff

contends that her GAF scores of 42 and 49 qualify her for disability.  A score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation), severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."  Id. at 34.  However, the FCS council who rated plaintiff's GAF score did not indicate that she could not work.  Because a score of 49 may not relate to plaintiff's ability to work, the score, standing alone, without further explanation, "does not establish an impairment severely interfering with an ability to perform basic work activities."  Eden v. Barnhart, 109 Fed.Appx. 311, 314 (10th Cir. 2004) (unpublished) (a GAF score of 50, standing alone, without further explanation, does not establish an inability to perform basic work activities.)  The undersigned finds that the RFC assessment relied on by the ALJ is supported by substantial evidence of record and the correct legal standard was applied.

As her second and third issues, plaintiff contends the ALJ erred in finding that plaintiff could return to her past work as a cashier and, alternatively, that she could perform other work in the national and regional economy.  Plaintiff relies on the vocational expert's testimony that her work as a cashier may not have been long enough to qualify her to return to that semi-skilled job.  At the hearing the vocational expert testified that it was unclear whether plaintiff worked as a cashier long enough to qualify her past work as semi-skilled or unskilled.  [R. 30].  The ALJ did not question plaintiff regarding the tasks she performed as a cashier.  In determining whether plaintiff's previous work qualifies as past relevant work, the ALJ must consider whether the work (1) was performed within the last fifteen years, (2) lasted long enough for the plaintiff to learn to do it, and (3) was substantial gainful activity.  See 20 C.F.R. §§ 416.965(a).  The Commissioner failed to address this issue in its response brief.  Instead, the Commissioner relies on the ALJ's step five determination

12

that plaintiff could perform other work in the national and regional economy.  The undersigned finds there is insufficient evidence of record to support the ALJ's finding at step 3.  The ALJ did not inquire whether plaintiff's employment lasted long enough for her to learn to do it as required under the regulations.

The ALJ made his determination in this case, alternatively at step five which shifted the burden of proof to the Commissioner.  A court must affirm the Commissioner's final decision if either the step four or step five disposition is supported by substantial evidence and applies the correct legal standard.  See Berna v. Chater, 101 F.3d 631, 633-34 (10th Cir. 1996).  The undesigned finds that even if there is insufficient evidence to support the ALJ's findings at step four, there was sufficient evidence to support his step five determination.  Plaintiff claims the ALJ's determination at step five is erroneous because he failed to account for her limitations in attention, concentration, and completion of tasks, claiming his limitation to simple tasks would not adequately accommodate her impairments.  The undersigned disagrees.

As discussed above, the ALJ provided detailed evidentiary support for his determination that plaintiff could perform sedentary work, limited to simple tasks.  The ALJ described the following hypothetical person to the vocational expert:  (1) a person of plaintiff's age [21 years old], (2) educational background [eighth grade education], (3) prior work experience [limited to no more than one month], (4) simple work, and (5) at a medium exertional level.  The undersigned finds that this hypothetical adequately encompassed plaintiff's current mental impairments, as found by the ALJ. With respect to this hypothetical person, the vocational expert described eight different jobs with adequate availability in Oklahoma.  Seven of those jobs, plaintiff admits qualify as "simple tasks." The undersigned finds that the ALJ's finding at step five is supported by substantial evidence and

13

the correct legal standard was applied.

As her fourth assignment of error, plaintiff challenges the ALJ's credibility assessment, claiming it is not supported by substantial evidence and the correct legal standards were not applied. Plaintiff argues the ALJ should have obtained a RFC assessment from plaintiff's treating physician, or a treating source and that he misinterpreted or took out of context plaintiff's statements.

In assessing plaintiff's credibility, the ALJ considered the evidence of record and found that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. The ALJ set forth the reasons behind his determination.

> In terms of the alleged psychological impairments, the undersigned acknowledges the trauma that the events the plaintiff described must have inflicted. Yet, no mental health treatment source has opined that the claimant's psychological state prevents her entirely from working. Also, the records from Family & Children's Services are sparse and without narrative on the claimant's progress or lack thereof. Also, a state mental Residual Functional Capacity Assessment shows Ms. Weigel with only one marked limitation in her social interaction. That one limitation is in the ability to interact appropriately with the general public. Her abilities to get along with coworkers, maintain socially appropriate behavior, accept instructions and respond appropriately to criticism, and to ask for assistance are all designated as "not significantly limited" (Exhibit 5F). Further, the claimant testified that she has anxiety attacks whenever she goes into public areas. Yet, in a functional report, she wrote of shopping in stores and going to weekly doctor appointments. The undersigned is unconvinced that the claimant is, as she wrote, truly unable to go anywhere without someone accompanying her. Her claim that she is bipolar is not supported by the medical evidence. Dr. Crall diagnosed only Mood Disorder, NOS. The only Axis I diagnosis given by Family & Children's Services on April 1, 2008 was PTSD (Exhibit 11F, p.1).

[R. 71]. Thus, the undersigned finds that the ALJ gave specific reasons for his credibility assessment. Plaintiff does not identify a treating physician which could have added any additional

14

medical evidence regarding plaintiff's mental RFC.  There is no evidence of record that plaintiff received medical consultation from a licensed physician.  Excluding the agency consultants, the only source treatment is the family counseling services plaintiff received from FCS.  From a review of the entire record, the focus of plaintiff's counseling with FCS was financial concerns, living arrangements with her multiple roommates and planning for her delivery date.  The record also shows that the Commissioner twice requested FCS to furnish additional documents to supplement the record, including a current treatment plan, medication plan, and physician assessment/psychosocial advocate.  [R. 428-429].  The supplemental records furnished by FCS are included in the administrative record.  [R. 429-442.].  FCS did not submit a treating physician or other treating source mental RFC.

Credibility determinations are peculiarly the province of the finder of fact, and a court should affirm that finding if it is closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.  Hill v. Astrue, 289 Fed. Appx. 289, 294 (10th Cir. 2008) (unpublished).  The evidence relied upon by the ALJ clearly shows that plaintiff's testimony is not entirely credible, and this finding is supported by substantial evidence.  Plaintiff fails to cite conclusive medical evidence which contradicts the ALJ's assessment of plaintiff's credibility.  Plaintiff's argument addresses the weight rather than the sufficiency of the evidence.

"In a social security disability case, the claimant bears the burden to prove her disability."  Wall v. Astrue, 561 F.3d 1048, 1062 (10th Cir. 2009).  Although an ALJ has a duty to develop the record, the duty is not unqualified.  The ALJ need only develop the record "consistent with the issues raised."  Id. at 1063, citing Henrie v. U.S. Dep't of Health & Human Serv., 13 F.3d 359, 360-61 (10th Cir. 1993).  On November 22, 2006, Dr. Burnard Pearce, PhD reviewed all the medical

15

evidence in the file and affirmed the mental RFC assessment made by Kathleen Gerrity on March 13, 2006, who concluded that plaintiff can adapt to a work situation. [R. 247, 426]. This conclusion was adopted by the ALJ in his decision. [R.71]. Thus, the undesigned finds that the ALJ's determination of plaintiff's credibility is supported by substantial evidence and the correct legal standards were applied.

## RECOMMENDATION

The undersigned finds that the ALJ evaluated the record in accordance with the legal standards established by the Commissioner and the courts and finds there is substantial evidence in the record to support the ALJ's decision. Accordingly, the undersigned RECOMMENDS that the decision of the Commissioner of the Social Security Administration denying plaintiff's claim for supplemental security income benefits be AFFIRMED.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by July 21, 2010.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to:

> determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

See also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make

16

timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)).  Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 7th day of July, 2010.


T. Lane Wilson
United States Magistrate Judge